CASE NO. 20-11032

_____

# UNITED STATES COURT OF APPEALS FOR THE FIFTH CIRCUIT

_____

CONTINENTAL AUTOMOTIVE SYSTEMS, INCORPORATED, *a Delaware corporation*,

*Plaintiff – Appellant,*

*v.*

AVANCI, L.L.C., *a Delaware corporation*; AVANCI PLATFORM INTERNATIONAL LIMITED, *an Irish company*; NOKIA CORPORATION, *a Finnish corporation*; NOKIA OF AMERICA CORPORATION, *a Delaware corporation*; NOKIA SOLUTIONS AND NETWORKS U.S., L.L.C., *a Delaware corporation*; NOKIA SOLUTIONS AND NETWORKS OY, *a Finnish corporation*; NOKIA TECHNOLOGIES OY, *a Finnish corporation*; OPTIS UP HOLDINGS, L.L.C., *a Delaware corporation*; OPTIS CELLULAR TECHNOLOGY, L.L.C., *a Delaware corporation*; OPTIS WIRELESS TECHNOLOGY, L.L.C., *a Delaware Corporation*; SHARP CORPORATION, *a Japanese corporation*,

*Defendants – Appellees.*

_____

Appeal From The United States District Court,
Northern District of Texas, Case No. 3:19-cv-02933-M
Hon. Barbara J. G. Lynn

_____

## PETITION FOR REHEARING EN BANC OF APPELLANT CONTINENTAL AUTOMOTIVE SYSTEMS, INC.

_____

*(Counsel Listed on Inside Cover)*

Stephen S. Korniczky
Martin R. Bader
Matthew W. Holder
SHEPPARD, MULLIN, RICHTER &
HAMPTON LLP
12275 El Camino Real, Suite 200
San Diego, California 92130-4092
Telephone:  858.720.8900
Facsimile:  858.509.3691

Jennifer Klein Ayres
SHEPPARD, MULLIN, RICHTER &
HAMPTON LLP
2200 Ross Avenue, Suite 2400
Dallas, TX  75201
Telephone:  469.391.7414
Facsimile:  469.391.7558

Karin Dougan Vogel
SHEPPARD, MULLIN, RICHTER &
HAMPTON LLP
501 West Broadway, Suite 1900
San Diego, CA 92101
Telephone: 619.338.6500
Facsimile: 619.234.3815

Michael W. Scarborough
Mona Solouki
Helen C. Eckert
SHEPPARD, MULLIN, RICHTER &
HAMPTON LLP
4 Embarcadero Center, 17th Floor
San Francisco, CA 94111-0000
Telephone:  415.434.9100
Facsimile:  415.434.3947

Mark S. Davies
ORRICK, HERRINGTON &
SUTCLIFFE LLP
1152 15th Street, NW
Washington, DC 20005
Telephone: 202.339.8631

E. Joshua Rosenkranz
ORRICK, HERRINGTON &
SUTCLIFFE LLP
51 West 52nd Street
New York, NY 10019
Telephone: 212.506.5000

*Attorneys for Appellant and Petitioner CONTINENTAL AUTOMOTIVE
SYSTEMS, INC.*

## CERTIFICATE OF INTERESTED PARTIES

The undersigned counsel of record certifies that the following listed persons and entities as described in the fourth sentence of Rule 28.2.1 have an interest in the outcome of this case.  These representations are made in order that the judges of this court may evaluate possible disqualification or recusal:

*Plaintiff-Appellant*:

1. Continental Automotive Systems, Inc. is wholly-owned by Continental Automotive, Inc.  Continental Automotive, Inc. is wholly-owned by Continental Automotive Holding Netherlands B.V., which is wholly-owned by CGH Holding B.V., which is wholly-owned by CAS-One Holdinggesellschaft mbH, which is wholly-owned by Continental Caoutchouc-Export-GmbH, which is owned 51% by Continental Automotive GmbH and 49% by Continental A.G.

2. No publicly-held company owns 10% or more of Continental Automotive Systems, Inc., however Continental Automotive Systems, Inc. is an indirect subsidiary of Continental A.G., a German public corporation.

*/s/ Matthew W. Holder*
Matthew W. Holder
Attorney for Appellant and Petitioner
Continental Automotive Systems, Inc.

## RULE 35(b)(1) STATEMENT OF COUNSEL

This petition presents the question of whether suppliers of components that practice patents essential to a technical standard, such as the 4G cellular standard, have Article III standing to sue when a standard-essential patent owner or its agent refuses to grant a license on fair, reasonable, and non-discriminatory terms, in violation of their contractual obligation to do so.  The panel answered that question in the negative.  In so holding, the panel created a conflict with a prior decision of this Court, as well as decisions from the Ninth Circuit and Federal Circuit.  *See HTC Corp. v. Telefonaktiebolaget LM Ericsson*, 12 F.4th 476, 481-82 (5th Cir. 2021); *Microsoft Corp. v. Motorola, Inc.*, 795 F.3d 1024, 1031 (9th Cir. 2015); *Microsoft Corp. v. Motorola, Inc.*, 696 F.3d 872, 876, 884 (9th Cir. 2012); *Ericsson, Inc. v. D-Link Sys., Inc.*, 773 F.3d 1201, 1209 (Fed. Cir. 2014).  The panel also contradicted Supreme Court precedent holding that the breach of a contract confers standing, and further that disputes about the scope of a contract or whether it was breached relate to the merits and not Article III standing.  *See Tenn. Elec. Power Co. v. Tenn. Valley Auth.*, 306 U.S. 118, 137-38 (1939); *Perry v. Thomas*, 482 U.S. 483, 492 (1987).

The panel's decision has broad implications for every industry that relies on products that implement technical standards.  The decision announces new rules with no support in the law or the industry-wide contracts at issue.  These novel

rules would open the door for standard-essential patent holders to evade their

commitments to license businesses whose products implement the standards.  This

will enable the patent holders to dictate which companies can and cannot obtain the

licenses they need to comply with the law and run their businesses, potentially

forcing certain companies out of the market altogether.

The Court should grant rehearing en banc and hold that Petitioner has

adequately alleged Article III standing.

*/s/ Matthew W. Holder*
Matthew W. Holder
Attorney for Appellant and Petitioner
Continental Automotive Systems, Inc.

# TABLE OF CONTENTS

**Page**

CERTIFICATE OF INTERESTED PARTIES ............................................i

RULE 35(b)(1) STATEMENT OF COUNSEL ..................................... ii

TABLE OF CONTENTS...........................................................iv

TABLE OF AUTHORITIES ....................................................... v

STATEMENT OF THE ISSUE.................................................1

STATEMENT OF COURSE OF PROCEEDINGS .................................1

STATEMENT OF FACTS ......................................................2

ARGUMENT ..............................................................5

I.    The Panel's Decision Creates an Inter- and Intra-Circuit Conflict and Disregards Supreme Court Precedent...............................................5

    A.    The panel's decision creates an intra-circuit conflict..........................6

    B.    The panel's decision creates an inter-circuit conflict..........................7

    C.    The panel's decision departs from Supreme Court precedent. ...........10

II.    The Panel's Decision Is One of Exceptional Public Importance as It Harms Every Business That Relies on Industry Standards and Rewards Anticompetitive Behavior. ...........................................12

    A.    The panel's decision disrupts the many industries that rely on promises made by SEP owners. ....................................................13

    B.    The panel's decision undermines the FRAND obligation and encourages anticompetitive behavior.................................................15

CONCLUSION ................................................................17

CERTIFICATE OF SERVICE .................................................18

CERTIFICATE OF COMPLIANCE............................................19

# TABLE OF AUTHORITIES

**Page(s)**

<u>**Cases**</u>

*Allied Tube & Conduit Corp. v. Indian Head, Inc.*
  486 U.S. 492 (1988) ........................................................................... 15

*Am. Soc'y of Mech. Eng'rs, Inc. v. Hydrolevel Corp.*
  456 U.S. 556 (1982) ........................................................................... 15

*Bell Atlantic Corp. v. Twombly*
  550 U.S. 544 (2007) ........................................................................... 11

*Broadcom Corp. v. Qualcomm Inc.*
  501 F.3d 297 (3d Cir. 2007) .................................................... 9, 15, 16

*Ericsson, Inc. v. D-Link Sys., Inc.*
  773 F.3d 1201 (Fed. Cir. 2014) ...................................................... ii, 9

*HTC Corp. v. Telefonaktiebolaget LM Ericsson*
  12 F.4th 476 (5th Cir. 2021) .................................. ii, 2, 3, 6, 7, 10, 16

*Katz v. Pershing, LLC*
  672 F.3d 64 (1st Cir. 2012) ................................................................ 11

*Maxim Crane Works, L.P. v. Zurich Am. Ins.*
  11 F.4th 345 (5th Cir. 2021) .............................................................. 10

*Microsoft Corp. v. Motorola, Inc.*
  696 F.3d 872 (9th Cir. 2012) ............................................ ii, 3, 6, 7, 8

*Microsoft Corp. v. Motorola, Inc.*
  795 F.3d 1024 (9th Cir. 2015) ................................................... ii, 2, 8

*Microsoft Corp. v. Motorola, Inc.*
  871 F. Supp. 2d 1089 (W.D. Wash. 2012) .......................................... 8

*Perry v. Thomas*
  482 U.S. 483 (1987) ..................................................................... ii, 10

*Servicios Azucareros de Venezuela, C.A. v. John Deere Thibodeaux, Inc.*
  702 F.3d 794 (5th Cir. 2012) ............................................................. 11

*Tenn. Elec. Power Co. v. Tenn. Valley Auth.*
  306 U.S. 118 (1939)........................................................................ ii, 10

## Statutes

15 U.S.C. §§ 1-2......................................................................................16

## Other Authorities

Article III.................................................................... ii, iii, 1, 4, 10

Fifth Circuit Rule 35 ............................................................................7

## STATEMENT OF THE ISSUE

Whether suppliers of components that practice patents essential to a technical standard, such as the 4G cellular standard, have Article III standing to sue when a standard-essential patent owner or its agent refuses to grant a license on fair, reasonable, and non-discriminatory terms, in violation of their contractual obligation to do so.

## STATEMENT OF COURSE OF PROCEEDINGS

Plaintiff Continental sued Defendants alleging antitrust and non-federal claims, including breach of contract, in order to obtain a declaration of its right to a license, a finding of Defendants' breach and violation of law, and a setting of license terms.  ROA.1754-1755.  Defendants moved to dismiss.  ROA.5941-5993.

The district court held that Continental had Article III standing but lacked antitrust standing and, alternatively, failed to state an antitrust claim.  The district court declined to exercise supplemental jurisdiction over the non-federal claims.  ROA.6674-6700.

The panel vacated the district court's judgment, holding that Continental lacked Article III standing.  Op. 10.  The majority did "not reach the parties' arguments as to antitrust standing and the merits."  Op. 14.  Judge Ho concurred in the judgment.  Op. 2 n.1.  Unlike the majority, he agreed with the district court "that Continental sufficiently alleged Article III standing," but believed

1

Continental failed to state an antitrust claim and thus would have affirmed the decision below.  *Id.*

## STATEMENT OF FACTS

This case concerns technologies at the center of our modern economy—the 2G, 3G, and 4G cellular standards that "permit interoperability between devices" by dictating how they communicate with each other.  *HTC Corp. v. Telefonaktiebolaget LM Ericsson*, 12 F.4th 476, 481 (5th Cir. 2021).  These and other standards are why someone can "connect to WiFi in a coffee shop, plug a hairdryer into an outlet, or place a phone call" no matter what brand of device they are using.  *Microsoft Corp. v. Motorola, Inc.* (*Microsoft II*), 795 F.3d 1024, 1030 (9th Cir. 2015).

Plaintiff Continental is a "leading provider of cutting-edge automotive components" that implement the cellular standards.  ROA.1694:16-1695:23.  Defendants include owners of patents alleged to be essential to these standards (standard-essential patents, or SEPs), as well as their licensing agent (Avanci, a patent pool).  ROA.1695:24-1696:6.  The cellular standards are set by private organizations (standard-setting organizations, or SSOs), including the European Telecommunications Standards Institute (ETSI), the Telecommunications Industry Association (TIA), and the Alliance for Telecommunications Industry Solutions

(ATIS), each of which is part of the Third Generation Partnership Project (3GPP). ROA.1695:14-23, ROA.1710:27-1711:21.

Because the creation of standards entails industry participants coming together to establish a monopoly, SSO policies require that those who own SEPs declare those patents to the SSO, and voluntarily commit to license them on terms that are fair, reasonable, and non-discriminatory (FRAND or RAND). ROA.1712:19-1715:5. Such commitments create a contract enforceable by third-party beneficiaries. *See HTC*, 12 F.4th at 481; *Microsoft Corp. v. Motorola, Inc.* (*Microsoft I*), 696 F.3d 872, 884 (9th Cir. 2012).

Defendants all committed to license on FRAND terms. ROA.1715:6-1720:2. Continental's products implement the cellular standards, and thus Continental alleged it is an intended third-party beneficiary of Defendants' contractual FRAND obligation. ROA.1699:14-1700:4, ROA.1713:10-26, ROA.1740:9-1741:8. The SSO policies do not contemplate any limitation on who is entitled to a license. Instead, they require that the patent holders license their SEPs to *all* applicants, as the complaint describes:

> [T]he IPR policies of all relevant SSOs expressly prohibit owners of FRAND-encumbered SEPs from discriminating among users of the standards. For example, the ETSI IPR Policy requires SEP owners to commit to provide "irrevocable licenses on fair, reasonable and nondiscriminatory ('FRAND') terms and conditions." The TIA policy requires any SEP holder that wishes to monetize its essential patents to commit to license SEPs "to *all applicants* under terms and conditions that are reasonable and non-discriminatory … to the extent

3

necessary for the practice of … the Standard." The ATIS policy requires SEP holders to commit that a license "will be made available to *applicants desiring to utilize the license for the purpose of implementing the standard* … under reasonable terms and conditions that are demonstrably free of any unfair discrimination." Other relevant SSOs' IPR policies are similar and consistent.

ROA.1699:21-1700:4 (emphasis added).

Despite Continental's repeated requests for a FRAND license, Defendants have failed and refused to license Continental. Instead, they are engaged in a scheme to charge non-FRAND royalties to Continental's customers (predominantly car manufacturers) based on the customers' use of Continental's products. Defendants' boycott of suppliers like Continental is an integral feature of this scheme because Defendants believe they have a greater opportunity to coerce the non-FRAND rates from car manufacturers than from suppliers. ROA.1697:7-1698:10, ROA.1721:8-17, ROA.1722:24-1724:18, ROA.1729:13-1730:3, ROA.1735:7-1741:8.

Faced with Defendants' refusals to provide it with licenses on FRAND terms, in violation of their commitment to the SSOs to do so, Continental sued Defendants. Even though the district court concluded that Continental had Article III standing, and this appeal in turn focused on whether Continental had viable antitrust claims, the panel held that Continental lacked Article III standing because "Continental does not appear to be an intended beneficiary [of Defendants' FRAND commitments] contractually entitled to a license on FRAND terms." Op.

4

11.  In the majority's view, Continental did not fit that bill because it "does not claim membership in the relevant SSOs," is not "a direct competitor" of Defendants, and "does not need SEP licenses from [Defendants] to operate" since Defendants' intent is to grant licenses to the car manufacturers at the end of the supply chain.  *Id.*  The majority also held that, even assuming Continental is a third-party beneficiary of Defendants' FRAND commitments, Continental did not suffer "an injury in fact."  Op. 11-12.  The majority said that granting licenses to car manufacturers "means that [Defendants] are making SEP licenses available to Continental on FRAND terms," and also that Continental "has not been denied property to which it was entitled" because "it does not need to personally own SEP licenses to operate its business."  Op. 12.  As addressed below, these statements are contrary to the allegations in Continental's complaint.

## ARGUMENT

## I.    The Panel's Decision Creates an Inter- and Intra-Circuit Conflict and Disregards Supreme Court Precedent.

This Court, the Ninth Circuit, and the Federal Circuit have all recognized that *any* business that implements the standards and seeks a license to an SEP is a third-party beneficiary of the patent holder's FRAND promise and can enforce that promise.  The panel's holding that Continental—a business seeking a license to SEPs for products that implement the cellular standards—is not an intended third-party beneficiary of Defendants' FRAND promises cannot be reconciled with

those decisions.  In addition, the panel's holding that Continental lacks standing

disregards Supreme Court precedent both on standing and the obligation to accept

the well-pleaded allegations in a complaint.  Rehearing en banc is necessary.

### A.    The panel's decision creates an intra-circuit conflict.

In *HTC*, decided shortly before oral argument in this matter, this Court

recognized that "[c]ompanies seeking to license under [FRAND] terms become

third-party beneficiaries of the contract between the [SEP] holder and the [SSO].

They are thus enabled to enforce the terms of that contract."  12 F.4th at 481

(citing *Microsoft I*, 696 F.3d at 885).

Under *HTC*, component suppliers like Continental that "seek[] to license

under [FRAND] terms" are third-party beneficiaries able to enforce those FRAND

commitments.  *Id.* at 481.  But not under the panel's decision here.  The *HTC* panel

did not qualify its conclusion about third-party beneficiary status in any way.

Unlike the panel here, the *HTC* panel never suggested that the company seeking a

license must be a member of the SSO, or a competitor of the licensor, or in a

particular position in the supply chain.  Nor did *HTC* suggest that a company lacks

the right to enforce the FRAND obligation unless it is targeted with a patent

infringement lawsuit.  *See id*.

No party mentioned *HTC* during argument.  This was not oversight.  There

was no reason for the parties to anticipate that the majority would limit the types of

companies that can be considered third-party beneficiaries of the contracts between SEP holders and SSOs. Defendants never even argued that Continental was not an intended beneficiary of the FRAND contracts. ROA.5941-5993. Nor was such a theory discussed at oral argument. To the contrary, Defendants' attack on Continental's antitrust claims was partly based on the premise that antitrust laws should not apply *because contract law provided an adequate remedy*. ROA.5975 ("This Court should find that it is inappropriate to open the doors to sweeping antitrust liability for a claim that should be addressed through the third-party beneficiary breach of contract theory."); Appellees' Brief, p. 52 ("[T]he FRAND commitment made by an SEP holder remains judicially enforceable in a breach-of-contract action regardless of the promisor's intent.").

The "direct[] conflict[]" between the majority's decision and *HTC* regarding who qualifies as a third-party beneficiary of the FRAND commitment is exactly the type of "extraordinary" circumstance that merits rehearing en banc under Fifth Circuit Rule 35.

## B. The panel's decision creates an inter-circuit conflict.

Like this Court in *HTC*, other circuits have explained that the FRAND commitment requires the patent holder to license its SEPs to *any* company that seeks a license. *HTC* relied on *Microsoft I*, where the Ninth Circuit held, contrary to the majority's reasoning here, that the FRAND commitment to an SSO "admits

of no limitations as to who or how many applicants could receive a license." 696 F.3d at 884. Indeed, through its FRAND commitment, the patent holder "promises to the [SSO] to license its [SEPs] worldwide to all comers." *Id.* at 885. Thus, *anyone* seeking a license on FRAND terms is a third-party beneficiary of that FRAND commitment. *See id.* at 884-85. The Ninth Circuit's later decision in *Microsoft II* again recognized that "an SEP holder cannot refuse a license to a manufacturer who commits to paying the RAND rate." 795 F.3d at 1031.

Here, the majority purported to distinguish *Microsoft I* on the ground that "third-party beneficiary Microsoft was itself a member of the SSOs that had negotiated FRAND contracts with Motorola." Op. 11 (quoting *Microsoft Corp. v. Motorola, Inc.*, 871 F. Supp. 2d 1089, 1092 (W.D. Wash. 2012)). But that factual distinction makes no difference. There is no indication that the Ninth Circuit relied on the district court's stray statement about Microsoft being an SSO member. And the Ninth Circuit explained without qualification that the FRAND commitment benefits "all comers," *Microsoft I*, 696 F.3d at 885, and "all seekers," *Microsoft II*, 795 F.3d at 1031—not merely SSO members.[1]

Like the Ninth Circuit, the Federal Circuit has recognized that SEP holders make "binding" commitments to SSOs to "grant licenses to an unrestricted number

---

[1] In any event, Continental's parent company *is* a member of ETSI, with representation on the Board. *See List of ETSI Board Members*, ETSI, https://portal.etsi.org/TB-SiteMap/BOARD/Board-Members.

of applicants on [FRAND] terms." *Ericsson, Inc. v. D-Link Sys., Inc.*, 773 F.3d 1201, 1209 (Fed. Cir. 2014).  As a result, an SEP holder who has made a FRAND commitment to an SSO "cannot … maintain[] a patent monopoly" by refusing to "licens[e] others to use the invention or by granting licenses under special conditions designed to preserve that monopoly." *Id.* at 1230.

In an effort to reconcile its decision with precedent from another circuit, the majority relied on *Broadcom Corp. v. Qualcomm Inc.*, 501 F.3d 297, 313-14 (3d Cir. 2007).  In the majority's view, Broadcom was a third-party beneficiary of Qualcomm's FRAND obligation only because Broadcom was a "direct competitor" of Qualcomm and "needed its SEP licenses to operate," whereas Continental purportedly does not meet that description vis-à-vis Defendants.  Op. 10-11.  But that principle can be found nowhere in *Broadcom*.  The Third Circuit did not even address the concept of third-party beneficiary status, or contract claims, or the notion that the parties being competitors could be relevant to a contract analysis.  Instead, the decision solely addressed the viability of Broadcom's antitrust claims.  *See* 501 F.3d at 306-22.

In sum, the panel's decision creates an inter-circuit conflict as to who can be a third-party beneficiary of the contractual commitment to license SEPs on FRAND terms.  Rehearing en banc is necessary to reconcile the circuit split.

9

**C.    The panel's decision departs from Supreme Court precedent.**

Rehearing en banc is also warranted because the panel departed from Supreme Court precedent in multiple ways.  First, the panel disregarded the fundamental principle that the question of whether a party can "enforce [an] agreement" "simply presents a straightforward issue of contract interpretation," not "standing under Article III."  *Perry v. Thomas*, 482 U.S. 483, 492 (1987); *see also Maxim Crane Works, L.P. v. Zurich Am. Ins.*, 11 F.4th 345, 350-51 (5th Cir. 2021) (holding that where a case turns on "a party's right to relief for breach of contract," "that is not 'a question of Article III standing' but 'one of contractual standing'") (citations omitted).  The panel should have concluded that Continental is a third-party beneficiary of Defendants' FRAND commitments, as the *HTC* panel and the Ninth and Federal Circuits would have held.  But to the extent there is any question regarding Continental's third-party-beneficiary status, that is a question on the merits and not one of jurisdictional standing.  *See id.*

Second, the panel also disregarded Supreme Court precedent when it concluded that even if Continental is a third-party beneficiary of Defendants' contractual FRAND commitments, Continental did not suffer "an injury in fact." Op. 12.  Under Supreme Court precedent, a party has standing to sue where "the right invaded is a legal right," such as "one arising out of a contract." *Tenn. Elec. Power Co. v. Tenn. Valley Auth.*, 306 U.S. 118, 137-38 (1939).  This Court has

10

thus recognized that "[i]njuries to rights recognized at common law—property, contracts, and torts—have always been sufficient for standing purposes." *Servicios Azucareros de Venezuela, C.A. v. John Deere Thibodeaux, Inc.*, 702 F.3d 794, 800 (5th Cir. 2012); *see also Katz v. Pershing, LLC*, 672 F.3d 64, 72 (1st Cir. 2012) (holding that "when a plaintiff generally alleges the existence of a contract … and a concomitant breach of that contract, her pleading adequately shows an injury to her rights").  By concluding that Defendants' refusal to license Continental on FRAND terms, in violation of their contractual commitments to do so, was insufficient to give Continental standing to sue for injunctive relief, the panel ignored those precedents.

In any event, the complaint explained why companies in Continental's position are harmed by Defendants' refusal to grant a license.  The panel concluded that Continental lacks standing only by ignoring its allegations and thereby contravening additional Supreme Court precedent.  *See Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555-56 (2007) (court must accept all allegations in the complaint as true at motion to dismiss stage).  For example, Continental's customers require that components be provided free and clear of third-party IP rights.  ROA.1720:25-1721:17; *see also* ROA.1698:19-1699:13, ROA.1728:28-1729:12, ROA.1734:18-1735:6.  As a result, the unavailability of FRAND licenses (1) interferes with Continental's ability to win business, keep customers, and enter

new markets, (2) hurts Continental's incentives to grow and invest, and (3) exposes

Continental to harm in the form of lost profits and loss of goodwill, among other

things.  ROA.1698:19-1699:13, ROA.1720:25-1721:17, ROA.1728:28-1729:12,

ROA.1734:18-1735:6, ROA.1741:9-14, ROA.1746:14-28.

Rehearing en banc is necessary to ensure that the Court adheres to Supreme

Court precedent.

## II.    The Panel's Decision Is One of Exceptional Public Importance as It Harms Every Business That Relies on Industry Standards and Rewards Anticompetitive Behavior.

In addition to creating inter- and intra-circuit conflicts and disregarding

Supreme Court precedent, the panel's decision significantly weakens the effect of

an SEP holder's commitment to license its technology on FRAND terms.  The

decision "go[es] against commonly held assumptions in the patent market place"

and "changes the axiom that *any* willing licensee implementer must be offered a

license on F/RAND terms."[2]  In so doing, the decision permits SSOs to be run like

private clubs, with patent owners picking and choosing which businesses to

license.  This has the potential to disrupt entire industries, undermines the purpose

---

[2] *No Harm, No Foul, and No Standing for Would-be SEP Implementer: 5th Circuit Changes Narrative on Patent 'Hold Up.'*  The National Law Review, Mar. 3, 2022, https://www.natlawreview.com/article/no-harm-no-foul-and-no-standing-would-be-sep-implementer-5th-circuit-changes (emphasis in original).

of the FRAND obligation, and converts SSO agreements into mechanisms for collusion.

### A.    The panel's decision disrupts the many industries that rely on promises made by SEP owners.

The panel's decision upends the norms and expectations of the multi-billion-dollar global ecosystem of standard-setting and FRAND licensing.  It permits SEP holders to refuse to license their technologies to *all* companies who ask for a license, as long as they license to *some* companies (and on non-FRAND terms).  But SSOs intended for SEP licenses to be widely available to *all* businesses that implement their standards, regardless of where the business is in the supply chain and whether or not it is an SSO member.

For example, the TIA and ATIS policies quoted in the complaint require SEP holders to license "*all* applicants" and "applicants desiring to utilize the license *for the purpose of implementing the standard*."  ROA.1699:21-1700:4 (emphasis added).  3GPP states that its members' policies "require [patent] holders to make licences available to *all* third parties, whether or not they are 3GPP Individual Members, under [FRAND] terms."[3]  The ETSI Directives also provide, without qualification, that "*third parties*" have rights "as *users* of ETSI standards"

---

[3] *FAQs*, 3GPP, https://www.3gpp.org/contact/3gpp-faqs#L5 (emphasis added).

to obtain "licenses on [FRAND] terms."[4]  As the former ETSI director put it, the

ETSI IPR Policy "allows *every* company that requests a license to obtain one,

*regardless of where the prospective licensee is in the chain of production* …."[5]

The panel's decision is directly contrary to all of this.

    The panel's decision also leaves businesses at a loss to understand if, and

when, they will be deemed a third-party beneficiary of the FRAND obligation.

The decision suggests membership in an SSO or being a competitor of the licensor

makes a company an intended third-party beneficiary.  Op. 10-11.  But most, if not

all, of the car manufacturers that Defendants wish to license do not meet either

criteria.  The decision then suggests that a company is an intended third-party

beneficiary if it "needs" a license.  Op. 11-12.  But under the panel's logic, a

business only "needs" a license if the patent holder says so, *e.g.*, by demanding the

business take a license or suing for infringement.  Not only does the panel's

approach allow SEP owners to unilaterally dictate who can and cannot receive a

license, but it would also mean that a prospective licensee's status as a third-party

beneficiary would vary case-by-case.  The same business could be considered a

third-party beneficiary relative to one SEP holder who sues that business for patent

---

[4] ETSI Directives, p. 62, § 1.4 (Dec. 21, 2021),
https://portal.etsi.org/directives/44_directives_dec_2021.pdf (emphasis added).

[5] Karl Heinz Rosenbrock, *Why the ETSI IPR Policy Requires Licensing to All*, https://www.fair-standards.org/wp-content/uploads/2017/08/Why-the-ETSI-IPR-Policy-Requires-Licensing-to-All_Karl-Heinz-Rosenbrock_2017.pdf (emphasis added).

infringement, but not a third-party beneficiary relative to another SEP holder who does not wish to license that business.  Such uncertainty risks causing businesses to be less likely to create products that implement the standards, as they will not know until after they have incurred substantial investments whether they will even have the ability to obtain SEP licenses on FRAND terms, or from which patent owners.  Such a regime has no predictability and nothing to do with what SSOs actually intended.

### B.    The panel's decision undermines the FRAND obligation and encourages anticompetitive behavior.

Because standard-setting "by definition" "eliminates alternatives to the patented technology" that becomes incorporated into a standard, *Broadcom*, 501 F.3d at 314, it "can be rife with opportunities for anticompetitive activity." *Am. Soc'y of Mech. Eng'rs, Inc. v. Hydrolevel Corp.*, 456 U.S. 556, 571 (1982). Although private standard-setting is permitted under the antitrust laws because of the understanding that it will "offer[] procompetitive benefits," *Allied Tube & Conduit Corp. v. Indian Head, Inc.*, 486 U.S. 492, 506-07 (1988), "the hope of [such] procompetitive benefits depends upon the existence of safeguards sufficient to prevent the standard-setting process from being biased by members with economic interests in restraining competition." *Id.* at 509.  Put simply, the contractual FRAND commitment "combat[s] the potential for anticompetitive

behavior," *HTC*, 12 F.4th at 481, and thus is an "important safeguard[] against monopoly power," *Broadcom*, 501 F.3d at 314.

The panel's decision guts that safeguard. The majority concluded that when an SEP holder refuses to license its technology on FRAND terms to an upstream component supplier like Continental, the supplier has no standing to challenge the SEP holder's breach of its FRAND commitment. Op. 10-12. The decision thus eliminates the primary tool for enforcing the FRAND obligation. By making it harder to enforce that obligation, the panel's decision significantly weakens the force of the FRAND commitment, which will have profound consequences. Under the decision, patent holders can license their SEPs to certain businesses while refusing to offer a license to others. That means SEP holders can collude to boycott businesses, or entire categories of businesses, potentially driving them from the market. The law does not tolerate such a blatant conspiracy to restrain trade and obtain a monopoly. *See* 15 U.S.C. §§ 1-2. But the panel's decision does, by making it impossible for the boycotted business to sue the SEP holder.

***

Holding that a business like Continental cannot enforce the FRAND obligation is inconsistent with widespread understandings of that obligation, will wreak havoc on any SEP-dependent industry that has a multi-level supply chain, and renders the obligation meaningless.

## CONCLUSION

For the foregoing reasons, this Court should grant rehearing en banc and rule that Continental has adequately alleged Article III standing.

Dated:  April 13, 2022

SHEPPARD, MULLIN, RICHTER & HAMPTON LLP

By      _____

               MATTHEW W. HOLDER

Attorneys for Appellant and Petitioner
CONTINENTAL AUTOMOTIVE
SYSTEMS, INC.

ORRICK, HERRINGTON & SUTCLIFFE LLP

By           */s/ Mark S. Davies*

               MARK S. DAVIES

Attorneys for Appellant and Petitioner
CONTINENTAL AUTOMOTIVE
SYSTEMS, INC.

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on April 13, 2022, a copy of the foregoing pleading was electronically served on counsel for Defendants-Appellees by filing the document with the Clerk of the United States Court of Appeals for the Fifth Circuit by using the electronic case filing system of the court.

*/s/ Matthew W. Holder*
Matthew W. Holder

## **CERTIFICATE OF COMPLIANCE**

This petition complies with the type-volume limitation of Fed. R. App. P. 35(b)(2)(A) because it contains 3,900 words, excluding the parts of the petition exempted by Fed. R. App. P. 32(f).

This petition complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because it has been prepared in a proportionally spaced typeface using Microsoft Word 2016 in 14 point font, with the footnotes in 12 point font consistent with Fifth Circuit Rule 32.1.

Dated:  April 13, 2022

SHEPPARD, MULLIN, RICHTER & HAMPTON
LLP

By          */s/ Matthew W. Holder*
MATTHEW W. HOLDER

Attorneys for Appellant and Petitioner
CONTINENTAL AUTOMOTIVE
SYSTEMS, INC.

# **OPINION**

# United States Court of Appeals for the Fifth Circuit

United States Court of Appeals
Fifth Circuit

**FILED**

February 28, 2022

Lyle W. Cayce
Clerk

No. 20-11032

_____

Continental Automotive Systems, Incorporated, *a Delaware corporation*,

*Plaintiff—Appellant,*

*versus*

Avanci, L.L.C., *a Delaware corporation*; Avanci Platform International Limited, *an Irish company*; Nokia Corporation, *a Finnish corporation*; Nokia of America Corporation, *a Delaware corporation*; Nokia Solutions and Networks U.S., L.L.C., *a Delaware corporation*; Nokia Solutions and Networks Oy, *a Finnish corporation*; Nokia Technologies Oy, *a Finnish corporation*; Optis UP Holdings, L.L.C., *a Delaware corporation*; Optis Cellular Technology, L.L.C., *a Delaware corporation*; Optis Wireless Technology, L.L.C., *a Delaware corporation*; Sharp Corporation, *a Japanese corporation*,

*Defendants—Appellees.*

_____

Appeal from the United States District Court
for the Northern District of Texas
USDC No. 3:19-CV-2933

_____

No. 20-11032

Before STEWART, HO, and ENGELHARDT, *Circuit Judges*.[1]

CARL E. STEWART, *Circuit Judge*:

This case is a new installment in a long-running battle between holders of patents essential to wireless standards and companies that make products incorporating those standards. Continental Automotive Systems, Inc. ("Continental"), an auto-parts supplier, brought suit in the Northern District of California against several standard-essential patent holders and their licensing agent, claiming violations of federal antitrust law and attendant state law. After the case was transferred to the Northern District of Texas, it was dismissed at the pleading stage. Continental appealed.

For the reasons that follow, we VACATE the judgment of the district court and REMAND with instructions to DISMISS for lack of standing.

## I. FACTUAL BACKGROUND

Plaintiff-Appellant Continental is a leading provider of automotive components, including connectivity products that utilize 2G, 3G, and 4G cellular standards.[2] One such product is the telematics control unit ("TCU"), a device that is embedded into the car and provides wireless connectivity. Today, TCUs allow many of us to stream music, navigate to destinations, and call for emergency assistance directly from our vehicles. They are widely anticipated to facilitate an even greater array of capabilities in tomorrow's connected car industry.

---

[1] Judge Ho would affirm the judgment of the district court that Continental sufficiently alleged Article III standing but failed to state a claim under the Sherman Act.

[2] A technical standard is "a specification of the design of particular goods or components . . . needed to ensure compatibility." JOHN BLACK ET AL., OXFORD DICTIONARY OF ECONOMICS (3d ed. 2009). A cellular standard is a specification that facilitates compatibility between devices within a cellular network.

No. 20-11032

Certain Nokia Corporation entities, PanOptis Equity Holdings entities, and Sharp Corporation (collectively, "Patent-Holder Defendants") all claim to own or license patents essential to the 2G, 3G, and 4G cellular standards set by standard-setting organizations ("SSOs"). These patents are known as standard-essential patents ("SEPs") since suppliers like Continental could not create standard-conforming products like TCUs without infringing them.

Given the importance of SEPs, and the steep cost for suppliers to switch standards, standardization can enable SEP holders to demand more for the right to use their patents than those rights are worth. This conduct is known as patent hold-up.[3] To mitigate the risk that SEP holders will extract more than the fair value of their patented technologies, many SSOs require them to agree to license their patents on fair, reasonable, and nondiscriminatory ("FRAND") terms for incorporation into a standard.[4] Notably, SSOs do not establish FRAND licensing rates; rather, they are set in negotiations between SEP holders and licensees after the standard-setting process is complete. Here, under contracts they have with SSOs, Patent-Holder Defendants are committed to license their cellular SEPs on FRAND terms.

---

[3] *See, e.g.*, *Ericsson, Inc. v. D-Link Sys., Inc.*, 773 F.3d 1201, 1209 (Fed. Cir. 2014) ("Patent hold-up exists when the holder of a SEP demands excessive royalties after companies are locked into using a standard."); U.S. Dep't of Just. & Fed. Trade Comm'n, Antitrust Enforcement and Intellectual Property Rights: Promoting Innovation and Competition 5 (2007) ("The ability of patentees to demand and obtain royalty payments based on the switching costs faced by accused infringers, rather than the ex ante value of the patented technology compared to alternatives, is commonly called 'hold-up.'").

[4] Some courts and commentators use "RAND" as an "alternative, legally equivalent abbreviation." *Microsoft Corp. v. Motorola, Inc.*, 696 F.3d 872, 877 n.2 (9th Cir. 2012).

Meanwhile, to facilitate patent licensing, many SEP holders enter into agreements with entities that act as licensing agents for a patent pool.[5] Here, Patent-Holder Defendants and thirty-seven non-parties to this suit entered into a patent licensing agreement (the Master License Management Agreement, "MLMA") with Avanci.[6] Avanci acts as the licensing agent for a pool of SEPs incorporated into cellular standards for connected devices—namely, vehicles. For a flat fee per device, it offers a "one-stop license" for connected cars. AVANCI, https://www.avanci.com (last visited Feb. 25, 2022).

At the heart of this case is the interplay of the FRAND and MLMA commitments, and whether this interplay presents an injury to Continental that can be reviewed and remedied. Since all of the SEPs for which Avanci acts as the licensing agent are encumbered by FRAND obligations, Avanci is similarly obligated to license them on FRAND terms. Yet under the MLMA, Avanci may sell licenses only to car manufacturers or original equipment manufacturers ("OEMs"). OEMs are downstream from Continental in the supply chain because they include connectivity products in their vehicles. But the MLMA permits members of the pool to individually license their SEPs beyond OEMs to suppliers like Continental at FRAND rates.

According to Continental, it sought SEP licenses from both Avanci and individual Patent-Holder Defendants (collectively, "Defendants-Appellees") at FRAND rates to no avail, in violation of the SEP holders' FRAND commitments. According to Defendants-Appellees, licenses were

---

[5] A patent pool "aggregate[es] intellectual-property rights that are the subject of cross-licensing, whether they are transferred directly by the patentee to a licensee or to some vehicle specifically established to administer the aggregated interests, such as a joint venture." *Patent Pool*, BLACK'S LAW DICTIONARY (11th ed. 2019).

[6] "Avanci" collectively refers to Avanci, LLC and Avanci Platform International Limited, both of which are parties to this lawsuit.

available to Continental on FRAND terms from individual SEP holders, and Continental does not need SEP licenses since Avanci licenses the OEMs that incorporate their products.

## II. Procedural History

Continental sued Avanci and Patent-Holder Defendants in the Northern District of California. In its amended complaint,[7] Continental argued that refusals to directly sell it a license on FRAND terms constituted not only a contractual breach but also anticompetitive conduct in violation of the Sherman Antitrust Act of 1890 ("the Sherman Act"), 15 U.S.C. §§ 1, 2. It further alleged violations of related state law, namely breach of contract, promissory estoppel, and unfair competition law. Finally, Continental sought declaratory relief as to Avanci and Patent-Holder Defendants' FRAND obligations and injunctive relief as to their unlawful conduct. It did not seek damages.

Shortly after Continental filed its amended complaint, Avanci and Patent-Holder Defendants moved to transfer venue to the Northern District of Texas under 28 U.S.C. § 1404(a). While that motion was pending, Avanci and Patent-Holder Defendants moved to dismiss Continental's amended complaint. Judge Lucy H. Koh then transferred the case, and Chief Judge Barbara M. G. Lynn (hereinafter, "the district court") ordered Avanci and Patent-Holder Defendants to file a revised motion to dismiss, accounting for Fifth Circuit law as well as "basic issues of standing and whether [Continental] has suffered an injury that can be reviewed at this juncture."

In their revised motion, Avanci and Patent-Holder Defendants sought dismissal under Rules 12(b)(1) and 12(b)(6) for lack of subject matter jurisdiction and for failure to state a claim upon which relief can be granted,

---

[7] Continental amended to add Sharp as a defendant after Sharp sued an OEM customer of Continental's for patent infringement.

respectively.[8] *See* FED. R. CIV. P. 12(b)(1); 12(b)(6). The district court accepted one of Continental's theories of injury for the purposes of constitutional standing, but it dismissed with prejudice Continental's Sherman Act claims for lack of antitrust standing and, alternatively, for failure to plausibly plead certain elements. It then declined to exercise supplemental jurisdiction over Continental's remaining claims pursuant to 28 U.S.C. § 1367(a). Continental timely appealed.

## III. STANDARD OF REVIEW

"[W]e always have jurisdiction to determine our own jurisdiction." *Tex. Democratic Party v. Hughs*, 997 F.3d 288, 290 (5th Cir. 2021). "Standing is a component of subject matter jurisdiction." *HSBC Bank USA, N.A. v. Crum*, 907 F.3d 199, 202 (5th Cir. 2018). "The jurisdictional issue of standing is a legal question for which review is de novo." *Id.* (citation omitted).

## IV. DISCUSSION

Our court must address any jurisdictional issue before reaching the merits of a plaintiff's claim. *See Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 94–95 (1998). "Article III of the Constitution limits the jurisdiction of federal courts to 'Cases' and 'Controversies.'" *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 157 (2014) (quoting U.S. CONST. art. III, § 2). Given this limitation, a plaintiff is required to demonstrate "the irreducible constitutional minimum of standing" to bring suit. *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560 (1992).

---

[8] They also moved to dismiss under Rule 12(b)(2) for lack of personal jurisdiction, but the district court did not assess the issue and none of the parties appealed that decision. *See* FED. R. CIV. P. 12(b)(2).

To establish Article III standing, a plaintiff must allege that it has "(1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision." *Ortiz v. Am. Airlines, Inc.*, 5 F.4th 622, 628 (5th Cir. 2021) (quoting *Spokeo, Inc. v. Robins*, 578 U.S. 330, 338 (2016)). "An injury in fact is 'an invasion of a legally protected interest which is (a) concrete and particularized, and (b) actual or imminent, not conjectural or hypothetical.'" *Wilson v. Hous. Cmty. Coll. Sys.*, 955 F.3d 490, 495 (5th Cir. 2020) (quoting *Lujan*, 504 U.S. at 560). "A claim of injury generally is too conjectural or hypothetical to confer standing when the injury's existence depends on the decisions of third parties not before the court." *Little v. KPMG LLP*, 575 F.3d 533, 540 (5th Cir. 2009) (citing *Simon v. E. Ky. Welfare Rights Org.*, 426 U.S. 26, 41 (1976)).

Continental alleges two theories of injury in fact. Neither are adequate to prove the supplier has Article III standing, let alone that it has antitrust standing or has suffered harm flowing from an antitrust violation.

## A. Indemnity Obligations

Continental's first theory of injury is that "*should* [Avanci and Patent-Holder Defendants] succeed in procuring . . . non-FRAND license[s] from . . . OEM[s,]" the royalties owed on those licenses "*risk* being passed through to . . . Continental" via indemnity agreements. The district court determined that this averred harm was insufficient to confer Article III standing since it is "not . . . actual or imminent." It emphasized that Continental's amended complaint did not allege that OEMs have been or likely will be forced to take non-FRAND licenses from Defendants-Appellees, or that those OEMs have or likely will pass non-FRAND costs onto Continental through indemnity obligations. Thus, according to the district court, Continental pled a mere "potential of [] being injured."

We agree. As Avanci and Patent-Holder Defendants observe, this alleged injury is "doubly speculative": Continental would not be harmed unless OEMs first accepted non-FRAND licenses and then invoked their indemnification rights against Continental. Here, the pleadings do not establish that OEMs have accepted such licenses and invoked such rights. Because Continental's "claim of injury depends on several layers of decisions by third parties—at minimum, [OEMs]"—it "is too speculative to confer Article III standing." *See Little*, 575 F.3d at 541; *see also Warth v. Seldin*, 422 U.S. 490, 499 (1975) ("[T]he plaintiff generally must assert his own legal rights and interests, and cannot rest his claim to relief on the legal rights or interests of third parties."); *cf. Millennium Petrochems., Inc. v. Brown & Root Holdings, Inc.*, 390 F.3d 336, 343 (5th Cir. 2004) ("[A]n indemnity claim does not . . . become actionable[] until all of the potential liabilities or damages . . . become fixed and certain.").

Continental seeks to bolster the adequacy of its allegations by referencing documents that the district court requested it submit to "convince [the court] that [Continental] ha[d] [suffered] potential injury." The district court ultimately made no substantive findings as to whether Continental's submissions were responsive or as to their contents, which it did not consider in connection with the motion to dismiss. This was within its discretion.

In reviewing Continental's submissions, we note some documents at most demonstrate that OEMs may seek to have Continental offset costs associated with licensing. "[A]s a potential contracting party, each [] is entitled to drive a hard bargain." *Wilkie v. Robbins*, 551 U.S. 537, 558 (2007). Once again, none of the documents indicate that an OEM has paid or will pay Avanci and Patent-Holder Defendants non-FRAND rates for a license. And none of the documents indicate that Continental has agreed or will agree to

No. 20-11032

indemnify OEMs for non-FRAND royalties paid to Avanci and Patent-Holder Defendants.

"This court f[inds] no overreaching to drive a hard bargain." *Twenty Grand Offshore, Inc. v. W. India Carriers, Inc.*, 492 F.2d 679, 682 (5th Cir. 1974). Defendants-Appellees' harm to Continental on account of Continental's indemnity obligations to OEMs remains speculative.[9]

### B. Refusal to License

Continental's second theory of injury is that Avanci and Patent-Holder Defendants have declined to provide Continental with a license on FRAND terms. The district court concluded that Continental pled a sufficient injury under this theory because "[t]he denial of property to which a plaintiff is entitled causes injury in fact." *Cont'l Auto. Sys., Inc. v. Avanci, LLC*, 485 F. Supp. 3d 712, 726 (N.D. Tex. 2020) (citing *Castro Convertible Corp. v. Castro*, 596 F.2d 123, 124 n.3 (5th Cir. 1979); *HTC Corp. v.*

---

[9] Meanwhile, the district court had no discretion to consider the new indemnity allegations that Continental made in its opposition to the motion to dismiss. As the district court explained:

> Briefing may clarify unclear allegations in a complaint. *Pegram v. Herdrich*, 530 U.S. 211, 230 n. 10 (2000). However, "it is axiomatic that a complaint cannot be amended by briefs in opposition to a motion to dismiss." *In re Enron Corp. Sec., Derivative & ERISA Litig.*, 761 F. Supp. 2d 504, 566 (S.D. Tex. 2011). Plaintiff cannot amend the [amended complaint], which only suggests the possibility that Plaintiff could be required to indemnify OEMs, with new factual allegations in its Response seemingly averring that it has already indemnified or will indemnify them.

*Cont'l Auto. Sys., Inc. v. Avanci, LLC*, 485 F. Supp. 3d 712, 725 (N.D. Tex. 2020). Notably, Continental had the opportunity to request leave to further amend its complaint and incorporate such allegations—an opportunity that it expressly declined, later reconsidered, and ultimately forfeited. *See infra* note 13. It appears the new allegations in Continental's opposition suffer from the same infirmities as those in the aforementioned submissions. Regardless, we join the district court in evaluating the harm that Continental actually pled, which is "conjectural and hypothetical." *See Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560 (1992).

No. 20-11032

*Telefonaktiebolaget LM Ericsson*, No. 18-CV-243, 2018 WL 6617795, at *4–5 (E.D. Tex. Dec. 17, 2018); *Servicios Azucareros de Venezuela, C.A. v. John Deere Thibodeaux, Inc.*, 702 F.3d 794, 800 (5th Cir. 2012)). According to the district court, Continental's alleged unsuccessful attempts to obtain licenses on FRAND terms from Defendants-Appellees comprise an injury in fact conferring Article III standing.[10] *Id*. at 727.

We disagree. Having reviewed the pleadings and relevant caselaw, we cannot conclude that Defendants-Appellees denied Continental property to which it was entitled and that Continental thereby suffered a cognizable injury in fact.

*i.*

As our sister circuits have recognized, entities that create standard-conforming products can be third-party beneficiaries under FRAND contracts between SSOs and SEP holders. *See, e.g.*, *Microsoft Corp. v. Motorola, Inc.*, 696 F.3d 872, 884 (9th Cir. 2012) (observing that Microsoft was a third-party beneficiary of the FRAND commitments made by Motorola to SSOs); *Broadcom Corp. v. Qualcomm Inc.*, 501 F.3d 297, 304, 313–14 (3d Cir. 2007) (observing that Broadcom was a third-party beneficiary of the FRAND commitments made by Qualcomm to SSOs). After all, FRAND obligations exist to protect the parties that must adopt a standard in order to conduct their business.

However, Continental is conspicuously different from the parties that our sister circuits have identified as third-party beneficiaries. In *Microsoft*,

---

[10] Although Continental did not allege an unsuccessful attempt to obtain a FRAND license from Sharp, the district court held that Sharp's "alleged agreement with the other Defendants to establish prices and refuse to license to Plaintiff at more favorable terms adequately pleads that Plaintiff has been injured by the Sharp Defendant" as well. *Avanci*, 485 F. Supp. 3d at 726; *see also supra* note 7.

third-party beneficiary Microsoft was itself a member of the SSOs that had negotiated FRAND contracts with Motorola. *See Microsoft Corp. v. Motorola, Inc.*, 871 F. Supp. 2d 1089, 1092 (W.D. Wash. 2012), *aff'd*, 696 F.3d 872 (9th Cir. 2012) ("Microsoft and Motorola are both members of the Institute of Electrical and Electronics Engineers ('IEEE') and the International Telecommunication Union ('ITU')."). Meanwhile, in *Broadcom*, third-party beneficiary Broadcom was a direct competitor of SEP holder Qualcomm that needed its SEP licenses to operate. *See Broadcom*, 501 F.3d at 304–05 (noting that both Broadcom and Qualcomm develop chipsets that must license Qualcomm's FRAND-encumbered SEPs).

Continental is not similarly situated to Microsoft and Broadcom. The supplier does not claim membership in the relevant SSOs and, crucially, it does not need SEP licenses from Defendants-Appellees to operate; Avanci and Patent-Holder Defendants license the OEMs that incorporate Continental's products. No evidence suggests that Patent-Holder Defendants and SSOs intended to require redundant licensing of third parties up the chain, which is unnecessary to effectuate the purpose of the FRAND commitments and reduce patent hold-up. "[A] beneficiary of a promise is an intended beneficiary if recognition of a right to performance in the beneficiary is appropriate to effectuate the intention of the parties." Restatement (Second) of Contracts § 302 (Am. L. Inst. 1981). Continental does not appear to be an intended beneficiary contractually entitled to a license on FRAND terms. And as an incidental beneficiary, it would have no right to enforce the FRAND contracts between the Patent-Holder Defendants and the SSOs. *Id.*

*ii.*

But assuming Continental is contractually entitled to a license on FRAND terms as a third-party beneficiary, the pleadings reflect that it has suffered no cognizable injury. Put another way, even if Continental has rights

under FRAND contracts, the contracts have not been breached because the SEP holders have fulfilled their obligations to the SSOs with respect to Continental. The supplier acknowledges that Avanci and Patent-Holder Defendants are "actively licensing the SEPs to the OEMs[,]" which means that they are making SEP licenses available to Continental on FRAND terms. As it does not need to personally own SEP licenses to operate its business, it has not been denied property to which it was entitled. And absent a "denial of property to which a plaintiff is entitled," Continental did not suffer an injury in fact. *Avanci*, 485 F. Supp. 3d at 726.

In support of its holding that the denial of property to which Continental was entitled caused the supplier injury in fact, the district court cited three cases in which courts identified deprivations that conferred Article III standing. *See Castro*, 596 F.2d at 124 n.3 (observing that the denial of an employer's alleged right under a group insurance contract to have proceeds paid to a legally correct beneficiary was a sufficient allegation of injury in fact); *HTC*, 2018 WL 6617795, at *4–5 (observing that the denial of an OEM's alleged right to a SEP license on FRAND terms was a sufficient allegation of injury in fact); *Servicios*, 702 F.3d at 800 (observing that the denial of a corporation's alleged right to commissions and profits deriving from an exclusive distributorship contract was a sufficient allegation of injury in fact).

We certainly do not take issue with these standing determinations and the core tenet of federal jurisdiction that "[i]njuries to rights recognized at common law—property, contracts, and torts—have always been sufficient for standing purposes." *Servicios*, 702 F.3d at 800 (citing Erwin Chemerinsky, Federal Jurisdiction § 2.3, at 67–68 (6th ed. 2012)). Rather, we reiterate that Continental, the Plaintiff-Appellant in this case, experienced no such injury. We also note that in none of the cases cited by the district court was there an allegation, like there is here, that the

plaintiff could otherwise receive the benefit of a right conferred by contract even if the contractual right was "denied" directly.[11]

### iii.

On the face of Continental's complaint, there are no allegations that Patent-Holder Defendants have sued or threatened to sue Continental for infringing their SEPs. To the extent that Continental is alleging Patent-Holder Defendants have sued or threatened to sue *OEMs* for infringement, requiring OEMs to accept an Avanci license on non-FRAND terms, the OEMs may find it easier to establish an injury in fact. *See HTC*, 2018 WL 6617795 (holding that Ericsson, an OEM, had standing to bring a counterclaim against HTC for breaching its obligation to offer Ericsson a license on FRAND terms); *see also Broadcom*, 501 F.3d 297 (holding that a deceptive FRAND commitment to a SSO may constitute actionable anticompetitive conduct under the Sherman Act). Similarly, the *SSOs* may find it easier to establish an injury in fact if Patent-Holder Defendants breached the FRAND contracts that they entered into for incorporation into cellular standards by charging non-FRAND rates.[12] But these are not Plaintiffs-Appellants we have before us.

---

[11] Avanci and Patent-Holder Defendants also argue that not having to take a license may allow Continental to produce its components at a lower cost. *See Fed. Trade Comm'n v. Qualcomm Inc.*, 969 F.3d 974, 996 (9th Cir. 2020) (observing that a policy of providing "de facto licenses" to component suppliers "allow[s]" Qualcomm's "competitors to practice Qualcomm's SEPs (royalty-free) before selling their chips to downstream OEMs").

[12] And to the extent that suing SEP holders is impossible or undesirable, the SSOs could conceivably troubleshoot on the front-end, clarifying FRAND rates and providing explicit enforcement mechanisms in their operating documents.

In sum, the district court erred in holding that Continental had Article III standing to bring its claims. Given that we lack jurisdiction, we do not reach the parties' arguments as to antitrust standing and the merits.[13]

## V. CONCLUSION

For the foregoing reasons, the judgment of the district court is VACATED. The case is REMANDED with instructions to DISMISS Continental's claims for lack of standing.

---

[13] While Continental states in its opening brief that the district court committed "error" in denying it leave to amend, Continental neither explains what the error was nor directly addresses the reasoning of the district court. "Given [Continental's] failure to adequately brief this issue, [it] has [forfeited] it on appeal." *See Denson v. BeavEx, Inc.*, 612 F. App'x 754, 759 (5th Cir. 2015) (per curiam) (citing *Procter & Gamble Co. v. Amway Corp.*, 376 F.3d 496, 499 n.1 (5th Cir. 2004) and FED. R. APP. P. 28(a)(8)(A)); *see also Ortiz v. Am. Airlines, Inc.*, 5 F.4th 622, 627 (5th Cir. 2021) (observing that "allud[ing] to an argument" in a brief is not sufficient to avoid forfeiture of that argument). Continental's attempt in its reply brief to clarify how further amendment would not prove futile does not save it from forfeiture. *See Dominguez-Gonzalez v. Clinton*, 454 F. App'x 287, 291 n.1 (5th Cir. 2011) (per curiam) (citing *Yohey v. Collins,* 985 F.2d 222, 225 (5th Cir. 1993)). We also note that in the Rule 16 conference the district court expressly asked counsel for Continental, "[d]o you want to amend your pleadings?" and counsel responded, "our pleading is absolutely sufficient."